UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RED POCKET, INC.,

                                    Plaintiff,

            v.

INTERACTIVE COMMUNICATIONS
INTERNATIONAL, INC.,

                                    Defendant.

No. 17-CV-5670 (KMK)

OPINION & ORDER

Appearances:

Thomas Francis Kelly, III, Esq.
Kelly & Meenagh
Poughkeepsie, NY
*Counsel for Plaintiff*

Frank E. Morreale, Esq.
Gregory Michael O'Neil, Esq.
Menachem David Possick, Esq.
Nelson Mullins Riley & Scarborough, LLP
Jacksonville, FL; Atlanta, GA; New York, NY
*Counsels for Defendant*

KENNETH M. KARAS, United States District Judge:

Red Pocket, Inc. ("Plaintiff") brings this Action against Interactive Communications

International, Inc. ("Defendant"), alleging breach of contract, breach of bailment, and

conversion. (*See* Am. Compl. (Dkt. No. 28); *see also* Not. of Removal (Dkt. No. 1).) Currently

before the Court are the Parties' Motions for Summary Judgment. (*See* Nots. of Mot. (Dkt. Nos.

131, 135).) For the reasons discussed below, both Motions are denied.

# I. Background

## A. Factual Background

The following facts are taken from the Parties' Rule 56.1 Statements and Counterstatements.[1]  (*See* Def.'s 56.1 Statement in Supp. of Def.'s Mot. ("Def.'s 56.1"); Pl.'s

---

[1] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  The nonmoving party, in turn, must submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  Local Civ. R. 56.1(b).  "If the opposing party . . . fails to controvert a fact set forth in the movant's Rule 56.1 statement, that fact will be deemed admitted pursuant to the local rule."  *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (quotation marks omitted); *see also T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (same).

Where the Parties identify disputed facts but with semantic objections only or by asserting irrelevant facts, these purported disputes, which do not actually challenge the factual substance described in the relevant paragraphs, the Court will not consider them as creating disputes of fact.  *See Baity*, 51 F. Supp. 3d at 418 ("Many of [the] [p]laintiff's purported denials—and a number of his admissions—improperly interject arguments and/or immaterial facts in response to facts asserted by [the] [d]efendants, often speaking past [the] [d]efendants' asserted facts without specifically controverting those same facts."); *id.* ("[A] number of [the] [p]laintiffs' purported denials quibble with [the] [d]efendants' phraseology, but do not address the factual substance asserted by [the] [d]efendants."); *Pape v. Bd. of Educ. of Wappingers Cent. Sch. Dist.*, No. 07-CV-8828, 2013 WL 3929630, at *1 n.2 (S.D.N.Y. July 30, 2013) (explaining that the plaintiff's 56.1 statement violated the rule because it "improperly interjects arguments and/or immaterial facts in response to facts asserted by [the] [d]efendant, without specifically controverting those facts," and "[i]n other instances, . . . neither admits nor denies a particular fact, but instead responds with equivocal statements"); *Goldstick v. The Hartford, Inc.*, No. 00-CV-8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (noting that the plaintiff's 56.1 statement "does not comply with the rule" because "it adds argumentative and often lengthy narrative in almost every case[,] the object of which is to 'spin' the impact of the admissions [the] plaintiff has been compelled to make").

Any party's failure to provide record support for its challenge to another party's factual statement could allow the Court to deem the challenged facts undisputed.  *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (explaining that the court is not required to search the record for genuine issues of material fact that the party opposing summary judgment failed to bring to the court's attention); *Baity*, 51 F. Supp. 3d at 418 (collecting cases holding that "responses that do not point to any evidence in the record that may create a genuine issue of material fact do not function as denials, and will be deemed admissions of the stated fact." (alteration and quotation marks omitted)).  Therefore, where the Court cites to only one of the

56.1 Statement in Supp. of Pl.'s Mot. ("Pl.'s 56.1"); Pl.'s 56.1 Counter Statement in Opp'n to Def.'s 56.1 ("Pl.'s Counter 56.1"); Def.'s Counter 56.1 Statement in Opp'n to Pl.'s 56.1 ("Def.'s Counter 56.1") (Dkt. Nos. 133, 140, 153, 157).)

Plaintiff is a foreign corporation engaged in the mobile telephone and internet business. (Pl.'s 56.1 ¶ 25.)  Plaintiff provides SIM cards and related mobile voice and data services in the United States under the brand name "Red Pocket Mobile."  (Def.'s 56.1 ¶ 2.)  Defendant is a distributor and technology provider of pre-paid and store value products to retail merchants.  (*Id.* ¶ 1.)

Plaintiff and Defendant worked together to manufacture, package, and distribute pre-paid mobile phone cards known as SIM Airtime Bundle Kits (the "Kits").  (Pl.'s 56.1 ¶¶ 26, 28.)  The packaged SIM card, which is a small programmable chip that allows customers to access Plaintiff's mobile voice and data services, is activated at the register of the vendor at the time of purchase.  (*Id.* ¶ 27; Def.'s 56.1 ¶ 5.)  On June 23, 2014, Plaintiff and Defendant entered into a SIM and Airtime Bundle Kit Distribution and Services Agreement (the "Distribution Agreement"), a valid and binding contract.  (Def.'s 56.1 ¶ 3.)  Generally, Plaintiff bore the cost of production prior to retail sale, and both Plaintiff and Defendant received portions of the proceeds from the retail sales of the Kits.  (*Id.* ¶ 10.)  Under the Distribution Agreement, Defendant delivered the Kits to be sold at several retail stores, including Target.  (Pl.'s 56.1 ¶ 28.)  Throughout 2014 and early 2015, Defendant distributed approximately 48,900 Kits to Target's distribution centers.  (Def.'s 56.1 ¶ 12.)  Target offered the Kits for sale in

Parties' Rule 56.1 Statements or Counterstatements, that fact is materially undisputed unless noted otherwise.

3

approximately 1,328 Target retail stores during that period, but sales were poor, and, as a result, in May 2015, Target decided to pull the Kits from the stores. (*Id*. ¶¶ 13–14.)

Target informed Defendant of its decision, and Defendant told Plaintiff about Target's decision, at which point Plaintiff asked Defendant to inquire about options for return of the unsold Kits. (*Id*. ¶¶ 14–15.) Target told Defendant that it required an 8% consolidation fee to cover Target's logistical costs to collect and return the unsold Kits. (*Id*. ¶ 16.) Although Defendant attempted to negotiate with Target to waive the fee, Target did not reduce or waive the fee. (*Id*. ¶ 17.) Defendant told Plaintiff that Target was planning on removing and destroying the unsold Kits from its stores. (*Id*. ¶ 18.)

Plaintiff asked Defendant to pay for the unsold Kits or pay the costs imposed by Target for return of the Kits. (*Id*. ¶ 19.) Defendant claims that it told Plaintiff that the Distribution Agreement did not provide for return of the product, but Plaintiff disputes that Defendant relied on the Agreement as a basis for not facilitating the return of the goods from Target. (*Id*. ¶ 20; *see also* Pl.'s Counter 56.1 ¶ 20.) Plaintiff never contacted Target about the return of the Kits. (Def.'s 56.1 ¶ 21.)

Target destroyed the unsold Kits beginning in May 2015. (*Id*. ¶ 22.) A Target representative, Ann Wolf, testified that the Kits were to be destroyed pursuant to Target's disposition policy, which instructed retail stores to destroy them at the conclusion of the product's "planogram cycle" pursuant to Defendant's agreement to that arrangement. (*Id*. ¶ 25.)

Certain key provisions of the Distribution Agreement color the underlying dispute. They are excerpted below:

<u>Section 2 – Authorization for Distribution of SIM Airtime Bundle Kits; Grant of Exclusive Rights</u>. Carrier hereby grants InComm an exclusive license to promote, market, distribute and sell the SIM Airtime Bundle Kits to retailers located within the United States, Puerto Rico and the U.S. Virgin Islands on a consignment basis

4

and the exclusive right to provide transaction processing services in connection therewith.

(Decl. of Gregory O'Neil, Esq. in Supp. of Def.'s Mot. ("O'Neil Decl.") Ex. 1 ("Distribution Agreement") 1–2 (Dkt. No. 136-1).)[2]

> Section 5 – Consignment; Payment Terms
>
> (a)  Consignment.  Carrier shall consign the SIM Airtime Bundle Kits to InComm as and when requested by InComm, subject to the terms of this Agreement.  The Parties will keep the consigned SIM Airtime Bundle Kits identifiable as the property of Carrier.  InComm agrees to hold all consigned SIM Airtime Bundle Kits within its care, custody and control with reasonable care and use commercially reasonable procedures to safeguard such consigned SIM Airtime Bundle Kits. InComm will remit payment to Carrier for SIM Airtime Bundle Kits sold by the Retailer(s) in the amount equal to the Face Value of each SIM Airtime Bundle Kit sold (i) less a commission and/or discount equal to the applicable percentage discount off of the Face Value of each SIM Airtime Bundle Kit sold (the "Commission/Discount") set forth in Schedule 3 attached hereto following sale of such SIM Airtime Bundle Kits by the Retailer(s), (ii) less the net value of all SIM Airtime Bundle Kits returned during the applicable period, and (iii) less the MDF to be retained by InComm as set forth below in Section 6.

(*Id*. at 3.)

> Section 8 – Returns; Carrier Customer Service.  Unless otherwise agreed in writing by the parties, Carrier will not accept physical returns of SIM Airtime Bundle Kits from the Retailer(s).  All customer service issues relating to the SIM Airtime Bundle Kits shall be directed to Carrier's customer care.  Carrier shall be responsible for handling all such customer services issues relating to the SIM Airtime Bundle Kits and for providing current customer care contact information to InComm and the Retailer(s).

(*Id*. at 5.)

> Section 12 – Warranty. . . . Carrier represents and warrants to InComm that: (a) all SIM Airtime Bundle Kits and their component parts are free from defects; [and] (b) title to SIM Airtime Bundle Kits (and each of their component parts) will be delivered at the time of shipment free and clear of all liens and claims . . . .

(*Id*. at 6.)

---

[2] The Distribution Agreement refers to Plaintiff as "Carrier" and Defendant as "InComm."  (*See id*. at 1.)

B.  Procedural Background

Plaintiff filed the Complaint, initially naming The Hanover Insurance Company, The Hanover Insurance Group, and Massachusetts Bay as defendants on May 16, 2017, in Dutchess County Supreme Court.  (*See* Not. of Removal Ex. A ("Compl.") (Dkt. No. 1-1).)  The case was removed to this Court on July 26, 2017.  (*See* Not. of Removal.)  Following an Initial Pretrial Conference on January 16, 2018, (Dkt. (minute entry for Jan. 16, 2018)), the Parties adopted a Case Management and Scheduling Order, (Dkt. No. 15).  On March 29, 2018, during discovery, Plaintiff amended the Complaint, naming Defendant and former defendants, Target and Massachusetts Bay Insurance Company ("MBIC").  (*See* Am. Compl.)  MBIC Answered on April 12, 2018, (*see* MBIC Ans. (Dkt. No. 31)), and Defendant Answered on May 10, 2018, (*see* Def.'s Ans. (Dkt. No. 39)).  Following a Pre-Motion Conference on July 17, 2018, (Dkt. (minute entry for July 17, 2018)), Target filed a Motion To Dismiss, (*see* Dkt. No. 61).  On January 4, 2019, the Court signed a Joint Stipulation withdrawing Plaintiff's claims for lost business income.  (Dkt. No. 112.)  On February 8, 2019, the Court signed a Stipulation of Voluntary Dismissal as to Plaintiff's claims against Target, thereby mooting Target's Motion To Dismiss and dismissing Target from the Action.  (Dkt. No. 123.)  A Scheduling Order for the instant Motion was adopted on February 8, 2019.  (Dkt. No. 124.)

The Parties filed their respective Motions on March 8, 2019.  (*See* Nots. of Mot.; Def.'s 56.1; Pl.'s 56.1; *see also* Def.'s Mem. of Law in Supp. of Def.'s Mot. ("Def.'s Mem."); O'Neil Decl.; Decl. of Jocelyn Kelly, Esq. in Supp. of Pl.'s Mot. ("J. Kelly Decl."); Pl.'s Mem. of Law in Supp. of Pl.'s Mot. ("Pl.'s Mem."); Decl. of Joshua Gordon in Supp. of Pl.'s Mot. ("Gordon Decl."); (Dkt. Nos. 134, 136–39).)  The Parties filed opposition papers on April 5, 2019.  (Pl.'s Counter 56.1; Def.'s Counter 56.1; *see also* Decl. of J. Kelly, Esq. in Opp'n to Def.'s Mot. ("J.

Kelly Opp'n Decl."); Pl.'s Mem. of Law in Opp'n to Def.'s Mot. ("Pl.'s Opp'n Mem."); Def.'s

Mem. in Opp'n to Pl.'s Mot. ("Def.'s Opp'n Mem."); Decl. of Gregory O'Neil, Esq. in Opp'n to

Pl.'s Mot. ("O'Neil Opp'n Decl.") (Dkt. Nos. 151–52, 156, 158).) Reply papers were filed on

April 24, 2019. (Pl.'s Reply Mem. in Supp. of Pl.'s Mot. ("Pl.'s Reply Mem."); Def.'s Reply

Mem. in Supp. of Def.'s Mot. ("Def.'s Reply Mem.") (Dkt. Nos. 165, 167).) Plaintiff and MBIC

had also filed Motions for Summary Judgment against each other in accordance with the same

briefing schedule. (MBIC Not. of Mot.; Pl.'s Not. of MBIC Mot. (Dkt. Nos. 127, 142).)

The Court had Oral Argument on all pending Motions on January 15, 2020. (Dkt.

(minute entry for Jan. 15, 2020).) At the argument, the Court granted MBIC's Motion for

Summary Judgment and denied Plaintiff's Motion for Summary Judgment against MBIC from

the bench. (Order (Dkt. No. 170).) MBIC was therefore dismissed from the case. However, the

Court reserved judgment as to the instant Motions, indicating that it would issue this written

Opinion & Order instead of an oral ruling. (*See id*.)

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir.

2014) (same). "In determining whether summary judgment is appropriate," a court must

"construe the facts in the light most favorable to the non-moving party and . . . resolve all

ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653

F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted); *see also Borough of Upper Saddle River

v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same). "It is the

movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . ., [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'"  *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").  And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)) (quotation marks omitted). However, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

As a general rule, "district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage." *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (noting that at the summary judgment stage, the court is not to "weigh the evidence and determine the truth of the matter"); *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.") (quotation marks omitted). Where the evidence presents "a question of 'he said, she said'" the court "cannot . . . take a side at the summary judgment stage." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010); *see also Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 535 (S.D.N.Y. 2017) (noting that "it is not the role

of the [c]ourt at summary judgment to resolve [a] factual clash"); *Bale v. Nastasi*, 982 F. Supp. 2d 250, 258–59 (S.D.N.Y. 2013) (stating that "[w]here each side . . . tells a story that is at least plausible and would allow a jury to find in its favor, it is for the jury to make the credibility determinations and apportion liability, and not for the court."). And, even if the non-movant's evidence is "thin, [a non-movant's] own sworn statement is adequate to counter summary judgment." *Scott v. Coughlin*, 344 F.3d 282, 290–91 (2d Cir. 2003) (holding that "[t]he credibility of [Plaintiff's] statements and the weight of contradictory evidence may only be evaluated by a finder of fact.").

B.  Applicable Law

To state a claim for breach of contract under New York law, a plaintiff must allege "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451, 468 (S.D.N.Y. 2014) (citation and quotation marks omitted).[3] "Because the plaintiff must prove each of these elements, the absence of a genuine issue of material fact due to lack of support for any one of them will require an award of summary judgment in favor of the defendant." *Marks v. N.Y. Univ.*, 61 F. Supp. 2d 81, 88–89 (S.D.N.Y. 1999) (citing *Celotex*, 477 U.S. at 322–23). "Where the contract language is wholly unambiguous, summary judgment is appropriate. Where the language is ambiguous, however, the contract's meaning generally becomes an issue of fact, thereby precluding summary judgment. The key question of whether the contract language is ambiguous is a question of law to be decided by the court. . . . Although interpretation of an ambiguous contract is generally a question of fact . . . , summary judgment nevertheless may be appropriate where

---

[3] The Distribution Agreement is governed by New York Law. (*See* Distribution Agreement 10.)

the court is able to resolve the ambiguity through a legal, rather than factual, construction of the contract terms." *Sarinsky's Garage Inc. v. Erie Ins. Co.*, 691 F. Supp. 2d 483, 485–86 (S.D.N.Y. 2010) (citations omitted).

Generally, the "fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent," and "unambiguous provisions of a[] . . . contract must be given their plain and ordinary meaning." *Catlin Specialty Ins. Co. v. QA3 Fin. Corp.*, 36 F. Supp. 3d 336, 340–41 (S.D.N.Y. 2014) (citations and quotation marks omitted), *aff'd*, 629 F. App'x 127 (2d Cir. 2015). "The language of a contract, however, is not made ambiguous simply because the parties urge different interpretations. Further, a court must avoid any interpretation that would be absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties." *Homeward Residential, Inc. v. Sand Canyon Corp.*, No. 13-CV-2107, 2014 WL 2510809, at *9 (S.D.N.Y. May 28, 2014) (citations and quotation marks omitted).

C. Application

1. The Distribution Agreement

Plaintiff principally argues that the Distribution Agreement created a consignment contract between the two Parties and that, because Defendant, the purported consignee and bailee, ultimately failed to return the Kits to Plaintiff, a presumption of negligence exists. (Pl.'s Mem. 7.) Defendant principally argues that, under a plain reading of the Distribution Agreement, it owed no duty to retrieve and return unsold Kits to Plaintiff. (Def.'s Mem. 6.) Defendant also argues that the Distribution Agreement limits Plaintiff to only direct damages and not indirect damages, such as lost revenue, (*id.* at 12), but Plaintiff does not appear to contest

this, and instead argues that by seeking the value of the Kits, it is indeed limiting itself to direct damages from the alleged breach, (Pl.'s Opp'n Mem. 10).

Under New York law, a "true consignment is an agency with a bailment and exists where one party—usually a wholesaler—transfers possession of goods to another—usually a retailer—who in turn resells the goods to third-party consumers." *Johnson v. Hallett*, No. 14-CV-1922, 2015 WL 1516661, at *6 (S.D.N.Y. Mar. 31, 2015) (citation and quotation marks omitted). Whereas in a sale, "there is a true sale in which title and risk of loss passes to the buyer-retailer and the buyer is entitled to retain *all* proceeds of a subsequent sale, liable to the seller only for payment of the purchase price . . . , in a consignment, the purchaser acts more like an agent, with an option to take title upon the occurrence of certain conditions. Title does not pass until that option is exercised. Title and right to immediate possession remain with the seller-wholesaler." *Rahanian v. Ahdout*, 694 N.Y.S.2d 44, 47 (App. Div. 1999) (emphasis in original) (citation omitted). Furthermore, under New York law, "where a bailee fails to return a bailor's property, there is a presumption of liability, and if the property cannot be found, a prima facie case of negligence exists." *Khaldei v. Kaspiev*, 135 F. Supp. 3d 70, 79 (S.D.N.Y. 2015) (citation, italics, and quotation marks omitted).

"In determining whether parties intend their transaction to be a consignment, courts look to certain indicia traditionally associated with the consignment relationship. To wit, a true consignment is characterized by the fact that the consignor retains ownership and sets the sale price; the consignee receives a commission and not the profits of the sale. Because the purchaser acts more like an agent, courts should look to signs of an agency relationship." *United States v. Nektalov*, 440 F. Supp. 2d 287, 298–99 (S.D.N.Y. 2006) (citations, footnotes, alterations, and quotation marks omitted), *aff'd*, 273 F. App'x 65 (2d Cir. 2008). Although the consignor's

12

reservation of title may be one factor in determining whether a transaction is true consignment, the "primary distinguishing factor is whether the consignee is acting as the consignor's agent, compensated by a commission on the retail price set by the consignor." *Italian Designer Import Outlet, Inc. v. N.Y. Cent. Mut. Fire Ins. Co.*, 891 N.Y.S.2d 260, 266 (Sup. Ct. 2009) (citations and quotation marks omitted).  Custom may also be an important factor, "since true consignments are the prevalent business arrangements for the sale of some goods."  *Id.* (citations and quotation marks omitted); *see also Matter of Friedman*, 407 N.Y.S.2d 999, 1006 (App. Div. 1978) (interpreting a contract as a consignment even when there was "language of absolute sale" in the contract because "consignments of art [and] not sales are the prevalent business arrangement" in the art industry).

Here, the Distribution Agreement contains a number of contradictory characteristics, some that are indicative of a consignment agreement and some that are indicative of a true sale. In Section 5, the contract refers to itself as a "consignment" agreement, (Distribution Agreement 3), but the introduction to the contract states that it sets forth the terms for an arrangement where "[Plaintiff] wishes to distribute and *sell* [the Kits] to [Defendant], for resale by [Defendant] to certain retail stores," (*id.* at 1 (emphasis added)).[4]  However, the contract also specifies that the price for which Defendant purchased the Kits was $0, (*id.* at 2), and, functionally, Defendant was

---

[4] As noted in *Matter of Friedman*, however, even "language of absolute sale" may not be dispositive in contractual interpretation if other factors relevant to the consignment analysis are more persuasive.  407 N.Y.S.2d at 1006.

to be compensated via a *commission* based on the "Face Value" of the Kits sold, (*id.* at 3).[5, 6]

This is significant because "[i]n a bona fide consignment transaction, no payment is made by the

consignee to the consignor unless and until the consignee has sold the goods to a third party."

*Nektalov*, 440 F. Supp. 2d at 301 (citation omitted); *see also Gem Diamond Co. of N.Y. v. Klein*,

No. 92-CV-2503, 1995 WL 72382, at *3 (S.D.N.Y. Feb. 21, 1995) (noting that in a consignment,

"the consignee receives a commission and not the profits of the sale"). However, adding even

more confusion, the contract defines "Face Value," the retail price of the Kits, as a value to be

determined by "the parties." (Distribution Agreement 1.) As mentioned above, the identity of

which party sets the retail price is one of the factors used to determine whether a consignment

has taken place, *see Nektalov*, 440 F. Supp. 2d at 299, but here, the record is unclear as to which

Party had the contractual right to do so.

Another factor in determining whether a consignment exists is whether the putative

consignor retains legal title to and ownership of the consigned items. *See id.* at 298–99. Here,

despite the contractual language indicating that Plaintiff was selling the Kits to Defendant for $0,

(*see* Distribution Agreement 2), nothing in the Distribution Agreement specifies who has title of

the Kits upon their delivery to Defendant, and, subsequently, to Target. Defendant points to

---

[5] Defendant also retained certain marketing development funds ("MDF") "to be used for promotion or marketing activities for the" Kits, which all required "prior written approval" from Plaintiff. (Distribution Agreement 3, 4.)

[6] As for payments, the Distribution Agreement specified that, on a monthly basis, Defendant would "remit payment" to Plaintiff of the amount of the "Face Value" of each Kit sold during the applicable accounting period, minus (1) a commission or discount, specified in Schedule 3 of the Distribution Agreement, (2) the net value of the Kits returned during the accounting period, and (3) the MDF retained by Defendant, pursuant to Section 6 of the Distribution Agreement. These calculations were to be based on Defendant's "sales reporting data for [the Kits]," and it was Defendant who bore the "risk of collection of funds from the Retailer(s) for amounts due." (Distribution Agreement 3.)

Section 12 as evidence that Plaintiff ceded title, (*see* Def.'s Mem. 10), but this section simply

warrants that title is free and clear of liens and claims and does not specify that title is

*transferred* to either Defendant or to Target prior to the ultimate consumer sale, (Distribution

Agreement 6 ("[Plaintiff] represents and warrants to [Defendant] that . . . title to [the Kits] (and

each of their component parts) will be delivered at the time of shipment free and clear of all liens

and claims.")).  On the other hand, the Distribution Agreement also does not specifically warrant

that Plaintiff *retained* title until the final consumer sale, a factor that cuts in favor of Defendant.

*See House of Diamonds v. Borgioni, LLC*, 737 F. Supp. 2d 162, 170 (S.D.N.Y. 2010) (quoting

language of a consignment contract where the contract specified that "[t]itle remain[ed]" in the

consignor).

Defendant also points out that the contract did not set out specific terms obligating

Defendant to handle returns from retailers or to pay those logistical and shipping costs.  (*See*

Def.'s Mem. 8.)[7]  But nor does it specifically *discharge* Defendant from bearing them.  In

support of its argument, Defendant points to Section 8, where the Distribution Agreement states

that Plaintiff "will not accept physical returns of [the Kits] from the Retailers."  (Distribution

Agreement 5.)  But that section also asserts this in the context of customer service issues,

suggesting it could reasonably be interpreted to pertain to post-consumer-sale returns, not

necessarily bulk returns of *unsold* Kits.  (*See id*.)  Moreover, even if Section 8 did also pertain to

---

[7] Plaintiff counters that Section 8's terms were subject to change through "writing by the parties" and that Schedule 2 constitutes this written agreement.  (Distribution Agreement 5; *see also* Pl.'s Opp'n Mem. 9.)  However, even assuming that Schedule 2 constitutes a writing that modifies the Distribution Agreement, it pertains to appropriate processes for consumer returns of Kits that were already activated at the point of sale.  (*See* Distribution Agreement 16.)  It specifies that Defendant will "pass[] on" "[e]ach return transaction" to Plaintiff to return the previously activated Kit to a "locked" status.  (*Id*.)  This section is not relevant to interpreting Defendant's duties of returning *unsold* Kits to Plaintiff.

unsold Kits, it still does not clearly disavow Defendant of the duties it would bear as a bailee should this contract be interpreted as a true consignment agreement.

Defendant also points to the provision where Defendant "agree[d] to hold all consigned [Kits] within its care, custody and control with reasonable care and use commercially reasonable procedures to safeguard such consigned [Kits]," (*id.* at 3), arguing first, that when the Kits were transferred to Target, they were beyond Defendant's "care, custody and control," and, second, that if needed, a commercial contract between two sophisticated business parties would have specified that Defendant's duty of care as to Plaintiff's Kits included responsibility for their safekeeping even when the Kits were at Target, (*see* Def.'s Mem. 8–11). This argument has some merit and may be probative of the credibility of Plaintiff's position as to the Parties' contractual intent, one factor in determining what type of contract this is, but it does not conclusively foreclose the argument that Defendant still owed Plaintiff duties as a bailee. Even assuming that this provision specifically articulated its duties when the Kits were under its care, custody, and control, that alone does not necessarily defeat the argument that the Distribution Agreement *as a whole* nevertheless constituted a consignment agreement, which would create a bailment and hold Defendant liable as bailee. *See Khaldei*, 135 F. Supp. 3d at 79 ("In New York, a consignment is considered, essentially, an agency with a bailment." (citation and quotation marks omitted)); *Martin v. Briggs*, 663 N.Y.S.2d 184, 187 (App. Div. 1997) ("A bailment may be created by operation of law. It is the element of lawful possession, and the duty to account for the thing as the property of another, that creates the bailment," including situations in which "possession results from contract." (citation and quotation marks omitted)); *Italian Designer*, 891 N.Y.S.2d at 266 ("A true consignment sale is merely an agency with a bailment and basically governed by the law of agency and service contracts." (citation, alterations, and

quotation marks omitted)); *see also Yamashita v. Scholastic, Inc.*, 784 F. App'x 825, 829 (2d Cir. 2019) ("It is the element of lawful possession, however created, and duty to account for the thing as the property of another that creates the bailment." (citation, italics, alterations, and quotation marks omitted)); *N. Assur. Co. Ltd. v. Wolk*, 49 N.Y.S.2d 754, 756 (App. Div. 1944) ("The defendant receiving the coats on consignment was a bailee and as such was required to use due and reasonable care." (citations omitted)), *aff'd*, 55 N.Y.S. 2d 389 (Mem) (App. Div. 1945).

Custom may also be an important factor in determining whether a contract is a consignment, "since true consignments are the prevalent business arrangements for the sale of some goods." *Italian Designer*, 891 N.Y.S.2d at 266 (citations and quotation marks omitted). Although Joshua Gordon ("Gordon"), Plaintiff's President, has testified that Plaintiff may have had some other, non-consignment contractual relationships with certain retailers, (*see* O'Neil Decl. Ex. 3 ("Gordon Dep.") 118–19 (Dkt. No. 136-3)),[8] neither Party has offered evidence of whether sales or consignment agreements are more common in the area of telecommunications retail distribution. This factor, therefore, is undeveloped in the record and plays a neutral role.

In determining whether a contract is a consignment, "courts should [also] look to signs of an agency relationship." *Nektalov*, 440 F. Supp. 2d at 299 (citation omitted); *see also Rahanian*, 694 N.Y.S.2d at 47 ("However, in a consignment, the purchaser acts more like an agent . . . ."); *Italian Designer*, 891 N.Y.S.2d at 266 ("The primary distinguishing factor is whether the consignee is acting as the consignor's agent, compensated by a commission on the retail price set by the consignor, rather than a fully-independent merchant, compensated by the difference between the price charged by the consignor and the retail price set by the consignee." (citations and quotation marks omitted)). "An essential characteristic of an agency relationship is that the

---

[8] In contrast, here, Defendant is not the retailer, but rather a distributor. (Def.'s 56.1 ¶ 1.)

agent acts subject to the principal's direction and control." *In re Shulman Trans. Enters., Inc.*, 744 F.2d 293, 295 (2d Cir. 1984) (citation omitted); *see also Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, No. 18-CV-7796, 2020 WL 248729, at *23 (S.D.N.Y. Jan. 15, 2020) ("The element of control often is deemed the essential characteristic of the principal-agent relationship." (citation and quotation marks omitted)).

Here, the Parties' business relationship exhibited some indicia of a principal-agency relationship between Plaintiff and Defendant, respectively. For example, the Distribution Agreement called for Defendant to engage in marketing activity for Plaintiff's product but noted that all promotional materials required Plaintiff's approval. (*See* Distribution Agreement 4.) Furthermore, John Steele ("Steele"), Defendant's vice president of sales operations for the wireless services division—who negotiated the Distribution Agreement with Gordon—testified that Defendant needed to obtain Plaintiff's approval before shipping the Kits to Target. (*See* O'Neil Decl. Ex. 2 ("Steele Dep.") 8, 100, 107 (Dkt. No. 136-2).) At one point, Steele also acknowledged that the Distribution Agreement was a consignment agreement, (*id*. at 105–06 ("Q: I mean this was a consignment agreement; is that not right? . . . THE WITNESS: Yes.")), and that Defendant was not "paying for the [Kits] up front" when they received them from Plaintiff, (*id*. at 109–10), but that the contract nevertheless did not require Defendant to facilitate the return of the unsold Kits from Target, (*see id*. at 112–13). On the other hand, Steele and Gordon both testified that Plaintiff was not privy to any of the contract terms between Defendant and Target and did not have "authorization by [Defendant] or contractually to interact directly with Target regarding its [Kits]," somewhat undermining the idea that Plaintiff maintained complete control over Defendant's distribution of its Kits. (Steele Dep. 101–02; *see also* Gordon Dep. 19–20 (noting that Plaintiff was not "made privy" to Defendant's contract with Target).)

Like the contract language itself, there is a genuine dispute of fact as to whether the Parties engaged in behavior reflective of the principal-agent relationship underlying many, if not all, consignment agreements.

Accordingly, the Court cannot conclude that, as a matter of law, the Distribution Agreement constituted a consignment agreement, nor can it conclude that it affirmatively did not constitute a consignment agreement. The language of the contract is not "wholly unambiguous," and therefore, summary judgment is inappropriate, since "interpretation of an ambiguous contract is generally a question of fact." *Sarinksy's Garage*, 691 F. Supp. 2d at 486. At this point in the litigation, the Court may not engage in "[a]ssessments of credibility and choices between conflicting versions of the events," which "are matters for the jury, not for the [C]ourt on summary judgment." *Vital*, 168 F.3d at 622 (citation and quotation marks omitted). The Court denies both Motions on the question of whether the Distribution Agreement constituted a consignment agreement. *See Gem Diamond*, 1995 WL 72382, at *3 (declining to grant summary judgment because "a genuine issue of material fact exist[ed] as to whether the alleged transactions were true consignments"); *Rahanian*, 694 N.Y.S.2d at 48 (declining to grant summary judgment where "a question of fact exist[ed] as to which type of contract [was] before the court").

### 2. Limitation of Damages

Defendant argues that Plaintiff should be limited to recovering only direct damages from breach of contract, but it appears that Plaintiff does not dispute this, as Plaintiff notes that it seeks "the cost of production of the lost or discarded Kits," and not lost profits. (Pl.'s Opp'n Mem. 10.) The purchase value or production value of destroyed property, when determined "with reasonable certainty," would be considered "general damages" in the context of a

consignment contract. *See Agbaje v. Bah*, No. 09-CV-6201, 2010 WL 6370541, at *3 n.1, 4 (S.D.N.Y. Dec. 23, 2010) (awarding consignor the value of damaged cars and noting that the "loss of [a] consignment" constitutes "general breach of contract damages"), *adopted by* 2011 WL 1197641 (S.D.N.Y. Mar. 25, 2011).

To the extent Defendant wishes to contest the accuracy and credibility of the amount of direct damages that Plaintiff seeks, (*see* Gordon Decl. ¶¶ 7–10 (calculating the value of the loss of the Kits as $121,320.00 plus statutory interest)), such arguments should be preserved for trial. The Court can only bar damages at summary judgment where there are "no disputed issues of material fact." *Hart v. Rick's Cabaret Intern., Inc.*, 60 F. Supp. 3d 447, 474 (S.D.N.Y. 2014) (collecting cases). As there is clearly a factual dispute requiring credibility judgments and inferences, and as Plaintiff is "at liberty to seek to establish . . . their damages claim at trial," the Court cannot grant summary judgment on the question of damages. *Id*. at 477; *see also Soley v. Wasserman*, No. 08-CV-9262, 2013 WL 526732, at *1 (S.D.N.Y. Feb. 13, 2013) ("[W]here adjudication of a claim requires assessing credibility . . . , summary judgment is not appropriate." (citations omitted)).

## III. Conclusion

For the foregoing reasons, the Court denies both Parties' Motions for Summary

Judgment. The Court will hold a Status Conference on March 5, 2020 at noon. The Clerk of

Court is respectfully requested to terminate the pending Motions. (Dkt. Nos. 131, 135.)

SO ORDERED.

Dated:     February 13, 2020
              White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE